## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

File No. 99-MDL-1309 PAM

In re Lutheran Brotherhood Variable
Insurance Products Company Sales
Practices Litigation

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

Plaintiffs and Defendant, Thrivent Financial for Lutherans ("Thrivent"), successor to Lutheran Brotherhood and Lutheran Brotherhood Variable Insurance Products Company ("Lutheran BrotherhoodVIP"),[1] submitted for approval a proposed settlement of this class action that is documented in a Stipulation of Settlement filed with the Court on December 15, 2004. The Court preliminarily approved the Stipulation of Settlement at that time, and directed the parties to send notice to Class Members. For the reasons set out below, the Court has determined that the Stipulation of Settlement is fair, reasonable, and adequate and is therefore approved. Accordingly, the Court makes the following Findings of Fact and Conclusions of Law.

---

[1] Thrivent Financial for Lutherans ("Thrivent") is a fraternal benefit society resulting from the January 1, 2002 merger of Lutheran Brotherhood into Aid Association for Lutherans. Thrivent is the successor to Lutheran Brotherhood. Lutheran Brotherhood Variable Insurance Products Company (nka Thrivent Life Insurance Company) is a wholly-owned subsidiary of Lutheran Brotherhood. As a result, references in these Findings of Fact and Conclusions of Law to "Defendants," "Thrivent," "Lutheran Brotherhood," and "Lutheran Brotherhood Variable Insurance Products Company" are used as are appropriate in the context but, in all events, are meant to pertain broadly to either Lutheran Brotherhood, Lutheran Brotherhood Variable Insurance Products Company, or Thrivent.

# I.      BACKGROUND

## A.      Materials Considered by the Court

1.      In reaching its decision in this case, the Court has considered the written memoranda of both parties, the affidavits filed by the parties, and the record before the Court, including the Court's extensive and intimate involvement with the prosecution of this case since it was first filed.  Both sides have fully briefed the request for approval, and have supported the request with numerous declarations of fact and expert witnesses. In addition, counsel for the Plaintiffs and Thrivent made oral presentations at the June 7, 2005, Fairness Hearing.

2.      As discussed in more detail below, the Court also considered the written objections submitted by Class Members, as well as the oral presentations made by objectors Paul G. Miller, pro se, and John H. and Rebecca J. Vogland, through their counsel, at the June 7, 2005, Fairness Hearing.

## B.      History of the Litigation

3.      This action began as five putative class action cases. The earliest case was filed on February 24, 1999, and five cases were removed from state court and/or were subsequently transferred by the Judicial Panel on Multi-District Litigation ("MDL") for pretrial proceedings to the District of Minnesota, captioned In re Lutheran Brotherhood Variable Insurance Products Company Sales Practices Litigation, MDL 99-1309.  The individual actions included in the MDL proceeding are (1) Thompson, et al. v. Lutheran

Brotherhood, et al., Case No. 99-485; (2) Eifler, et al. v. Lutheran Brotherhood, et al., Case No. 99-484; (3) Locke, et al. v. Lutheran Brotherhood, et al., Case No. 99-1153; (4) Paulson v. Lutheran Brotherhood, Case No. 99-CV-1328; and (5) Watson, et al. v. Lutheran Brotherhood Variable Insurance Products Company, et al., Case No. 99-2055. Three additional class actions were subsequently filed in Hennepin County Court in the State of Minnesota by Plaintiffs' counsel. These actions are (1) Ahlfeldt, et al. v. Lutheran Brotherhood, Case No. MC 00-001070; (2) Johnson, et al. v. Lutheran Brotherhood, Case No. MC 00-001069; and (3) Smerud, et al. v. Lutheran Brotherhood, Civil Action No. CT 99-11138. The identified cases collectively are referred to as "the Actions."

4.      Plaintiffs filed a Consolidated Amended Class Action Complaint on October 6, 2000.

5.      On June 6, 2001, the Court certified the following class:

> a limited class to maintain a claim for violations of Minnesota's Prevention of Consumer Fraud Act, which class is limited to persons to whom, between January 1, 1982, and the present, Lutheran Brotherhood sold a life insurance policy through the use of a payment method under which, or written illustrations which projected that, the obligation to pay for any portion of the policy would vanish or be offset by using dividend and/or interest, or cash value from the policy being purchased or any previously policy [sic] owned or in force.

In re Lutheran Bhd. Variable Ins. Prods. Co. Sales Practices Litig., 201 F.R.D. 456, 465 (D. Minn. 2001) (Magnuson, J.).

6.      On May 17, 2002, the Court granted Thrivent's Motion for Partial Summary Judgment on statute of limitations grounds and dismissed the Minnesota's Prevention of Consumer Fraud Act ("MPCFA") claims of eight of the eleven MDL plaintiffs.  See In re Lutheran Bhd. Variable Ins. Prods. Co. Sales Practices Litig., No. 99-1309, 2002 WL 1023150 (D. Minn. May 17, 2002) (Magnuson, J.).

7.      Plaintiffs then moved the Court to allow Mark and Ruth Wimmer and Angela and Richard Perrin to join Barbara Watson as named plaintiffs and class representatives.  The Court granted their request in October 2002. In re Lutheran Bhd. Variable Ins. Prods. Co. Sales Practices Litig., 99-1309, 2002 WL 31371945 at *4 (D. Minn. Oct. 7, 2002) (Magnuson, J.).

8.      Plaintiffs filed the Consolidated Second Amended Class Action Complaint on October 10, 2002, asserting inter alia, an MPCFA class claim on behalf of Barbara Watson, Mark and Ruth Wimmer, and Richard and Angela Perrin (the "Class Representatives").  Thereafter, notice of pendency of the class action was provided to Class Members in a mailing that commenced on January 3, 2003.  Class Members, as certified by this Court with respect to the MPCFA claims, were limited to those policyholders who purchased their policies on or after February 24, 1993, and not later than December 31, 2001.

9.      On December 14, 2004, Plaintiffs filed the Third Amended Consolidated Class Action Complaint.

10.    Before commencing the Actions, as well as during litigation and settlement negotiations, counsel for Plaintiffs conducted a thorough examination and evaluation of the relevant law and facts and retained experts to assist them in assessing the merits of Plaintiffs' claims and potential claims, and conducted further investigation to determine how best to serve the interests of Plaintiffs and the Class.

11.    In the course of their examination and investigation, and before the close of discovery, counsel for Plaintiffs, their experts and investigators conducted an extensive discovery effort.   Plaintiffs' counsel reviewed in excess of 1.5 million pages of documents produced by Lutheran Brotherhood and Thrivent, and thousands of pages of documents produced by third parties, including reports of various departments of insurance in the states in which Lutheran Brotherhood and Thrivent conducted their business.   Plaintiffs' counsel also took and defended numerous depositions, served and received responses to eight sets of interrogatories from Thrivent, and have conducted other extensive informal discovery.   In addition, Plaintiffs' counsel retained and consulted with experts concerning information obtained through the discovery conducted in this matter, the merits of Plaintiffs' claims, and the merits of Thrivent's defenses. Plaintiffs' counsel received detailed reports prepared by the experts.   Plaintiffs' counsel and their professional consultants also conducted a thorough examination and evaluation of the relevant law, facts and allegations to assess the merits of Plaintiffs' claims and potential claims and to determine the strength of Thrivent's defenses and Thrivent's liability for relief sought in the Actions.

12.     John W. Borg, the Special Master charged with mediating the settlement negotiations between the parties, also has conducted a review of the facts of this matter, including the findings of the Minnesota Commissioner of Commerce, the Alaska Department of Commerce and Economic Development's Division of Insurance, and the Division of Insurance of the State of Nevada's Department of Business and Industry, and other documents regarding the sales and marketing practices of Lutheran Brotherhood and its sales agents.

13.     Based upon their discovery, investigation and evaluation of the facts and law relating to the matters alleged in the pleadings, and based on their review of the findings of regulators and rating agencies, counsel for the Plaintiffs and the Class agreed to settle the Actions pursuant to the provisions of the Stipulation of Settlement after considering, among other things, (1) the substantial benefits available to the Plaintiffs and the Class under the terms of the Stipulation of Settlement, (2) the attendant risks and uncertainty of litigation, especially in complex actions such as this, as well as the difficulties and delays inherent in such litigation, and (3) the desirability of consummating the Stipulation of Settlement to provide prompt, effective relief to the Plaintiffs and the Class.

14.     Thrivent has raised a number of general and affirmative defenses to Plaintiffs' allegations in the Actions, and Thrivent believes that the results of the investigations of Lutheran Brotherhood that were conducted by the Minnesota Commissioner of Commerce, the Alaska Department of Commerce and Economic

Development's Division of Insurance, and the Division of Insurance of the State of Nevada's Department of Business and Industry establish that neither Lutheran Brotherhood nor Thrivent nor their agents engaged in any pattern or practice of wrongdoing or misrepresentation as alleged in the Consolidated Amended Class Action Complaint or otherwise, facts that the report issued by Special Master Borg affirms. Furthermore, Thrivent, for itself and Lutheran Brotherhood, expressly denies any wrongdoing, including, but not limited to, such wrongdoing as particularly alleged in the pleadings. Thrivent does not admit or concede any actual or potential fault, wrongdoing or liability in connection with any facts or claims that have been, or could have been, alleged against it in the Actions, or in any other matter. To the contrary, Thrivent asserts that the facts establish that the allegations raised in the Actions are false. Nevertheless, Thrivent considers it desirable for the Actions to be settled and dismissed because this settlement will: (1) provide substantial benefits to Thrivent's current and former policyholders; (2) put Plaintiffs' claims and the underlying matters to rest; (3) allow Thrivent to terminate litigation against its members, a prospect which Thrivent opposes; and (4) avoid the substantial expense, burdens and uncertainties associated with continued litigation of those claims.

C.    Plaintiffs' Allegations

15.    The Consolidated Amended Class Action Complaint was brought on behalf of persons or entities who between January 1, 1982, and September 15, 2004, purchased an ownership interest in certain Lutheran Brotherhood and/or Thrivent Financial for

Lutherans policies,[2] but does not include a person or entity (unless and to the extent the person or entity is a Settlement Class Member by virtue of an ownership interest in another Policy): (1) who had (at the time of the insured's death) an ownership interest in the Policy where the Insured died while the Policy was in-force and a death benefit was paid or is payable, (2) who signed a document that releases Lutheran Brotherhood or Thrivent from any further Claims concerning the Policy, (3) whose rights and claims respecting the Policy have been finally adjudicated in a court of law or in Thrivent's ADR process as set forth in Section 12 of Thrivent Bylaws, (4) who is or was an officer (vice president or above) or in-house counsel of Lutheran Brotherhood or Thrivent, or the spouse or other immediate family member thereof, (5) who is excluded from the Class pursuant to Section VI of the Stipulation of Settlement, (6) any insurance company that has or had an ownership interest in the Policy pursuant to an absolute assignment effected as part of an Internal Revenue Code §1035 exchange, or (7) any person whose claims or potential claims were addressed by accord and satisfaction.

---

[2] With respect to this Settlement, "Policy" or "Policies" means one or more of the following life insurance policies, which was purchased during the Settlement Class Period: (1) Lutheran Brotherhood or post-merger Thrivent universal life insurance policy; (2) Lutheran Brotherhood or post-merger Thrivent Presidential Plus series policy; (3) Lutheran Brotherhood or post-merger Thrivent traditional life insurance policy; and (4) Lutheran Brotherhood, Lutheran BrotherhoodVIP Company, or post-merger Thrivent variable life insurance policy.

"Policy" or "Policies" does not include: (a) variable annuities issued by Defendant; (b) term life insurance issued by Defendant; and (c) an insurance policy canceled (with refund of premium paid, if any), in accordance with a state's "free-look" or "right-to-examine" law or an insurance policy rescinded by Lutheran Brotherhood with a return of all premiums paid.

16.     The Consolidated Amended Class Action Complaint asserted various state law claims, including common law fraud, breach of fiduciary duty, and a claim under the MPCFA for Lutheran Brotherhood's purportedly fraudulent and deceptive sales practices, including the "vanishing premium" sales presentations that were used to make the performance of its insurance products appear more attractive to Plaintiffs.    The Consolidated Amended Class Action Complaint alleged, among other things, that Lutheran Brotherhood misrepresented (1) that a single prepayment or a fixed limited number and/or amount of premium payments would cover all out-of-pocket premiums due on Lutheran Brotherhood policies throughout the Plaintiffs' lives or for a specified period; (2) the reasonableness of (or failure to disclose the known or potential variability of) interest crediting rates, policy charges, cash values and/or benefits illustrated or projected to Plaintiffs; (3) the cash value and/or benefits to be realized or paid based on a fixed number and/or amount of cash payments; (4) the financial impact of policy replacement on the policyholder; (5) the financial impact on the policyholder of surrendering, or using loans or withdrawals of cash values or other accumulated values, from an existing policy issued either by Lutheran Brotherhood or another insurance company to purchase the policies. The Consolidated Amended Class Action Complaint also alleged that Lutheran Brotherhood failed to adequately supervise, educate and train its nationwide sales force of agents.

17.     Thrivent has denied all allegations of wrongdoing.

D.      The Parties and their Counsel

18.     The Class Representatives:  Barbara Watson, Ruth and Mark Wimmer, Angela and Richard Perrin, Sandra Rost, and Gerald Zimmerman.  (See Stipulation of Settlement at 24.)

19.     The Class Representatives alleged a wide variety of fraudulent conduct on behalf of Thrivent and Lutheran Brotherhood in their marketing, sale, servicing and administration of their life insurance policies.

20.     Class Counsel:  The Plaintiffs and the Class are represented by the law firm of Lockridge Grindal Nauen P.L.L.P ("Class Counsel").  Class Counsel is experienced plaintiffs' counsel with expertise in insurance, consumer and class action litigation.  (See Aff. of Richard A. Lockridge ("Lockridge Final Approval Aff.") ¶ 4.)

21.     Defendant:  Thrivent Financial for Lutherans is the largest fraternal benefit society in United States.  It is also a Fortune 500 company with 2.8 million members. Like its predecessor fraternal benefit societies, Thrivent and its subsidiaries and affiliates offer a broad range of financial products and services including life insurance, annuities, mutual funds, disability income insurance, and other products.  (See Aff. of David Westmark, Thrivent Vice President and Senior Associate General Counsel, ("Westmark Aff.") ¶ 4.)

22.     Defendant's Counsel:  Thrivent is represented by the firms of Kirkland & Ellis LLP and Faegre & Benson LLP.  Both of these firms have extensive experience in the defense of complex and class action litigation.

E.     The Settlement

23.     Both the Actions and the other related actions were vigorously contested from the time they were filed.

24.     Thrivent and Class Counsel engaged in settlement discussions for well over twelve months in 2003-2004.  (See Aff. of Joseph J. DeSanctis ("DeSanctis Aff.") ¶ 9.) Special Master Borg, who was appointed by this Court as a mediator to conduct and facilitate the settlement discussions, assisted in the settlement process.

25.     The parties began settlement discussions in 2003 and continued throughout 2004, which addressed, among other things, the general parameters of relief that would be included in any settlement.  (Id. ¶ 5.)  There were many meetings, both by telephone and face-to-face, during this time which were very contentious, and the discussions were often heated.  (Id.)

26.     The parties focused on a settlement framework similar to that adopted in other cases involving life insurance sales practice class actions – i.e., a framework that would include an alternative dispute resolution process, as well as relief for Class Members who did not elect to participate in that process.  (Id. ¶ 6.)  As a result of the frequent discussions between the parties, the terms and duration of the relief awarded

under both the Contributed Insurance Benefit and the Claim Review Process increased in favor of the Class during the course of the settlement negotiations.  (Id.)

27.     The final settlement terms were negotiated until September 2004.  (Id. ¶ 7.) After the settlement terms were set, an agreement on fees and expenses for counsel to the Plaintiffs was negotiated and concluded on or about September 15, 2004, and a Memorandum of Understanding was executed.  (Id.)

28.     After further discussions and contentious negotiations regarding the details of the settlement and settlement documents and administration, a Stipulation of Settlement was signed in December 2004.  (Id. ¶¶ 8-9.)

F.     The December 15, 2004, Hearing and Preliminary Approval Order

29.     On December 15, 2004, the Court held a hearing at which it preliminarily approved the Stipulation of Settlement and directed the parties to send notice to the Class.

30.     Subsequently, the Court formally entered its Findings and Order, wherein it found that the Stipulation of Settlement was "sufficiently fair, reasonable and adequate to warrant sending notice of the Actions and proposed settlement" to Class Members.

31.     Consistent with the Court's Findings and Order, the parties provided notice of the proposed settlement to Class Members.  Thrivent, with Class Counsel's approval, selected a well-experienced settlement administrator, Rust Consulting, Inc. ("Rust"). Rust arranged for the mailing of the Class Notice and publication of the Publication Notice and established a Class Action Information Center, including a toll-free telephone

bank, to receive and respond to Class Member inquiries regarding the Actions and proposed settlement.  (See Aff. of Kristin Dahl ("Dahl Aff.") ¶¶ 5-37.)

G.    The June 7, 2005, Fairness Hearing

32.    The parties filed extensive memoranda, declarations and reports with the Court prior to the Fairness Hearing.  These submissions, which were filed with the Court on May 23, 2005, included numerous declarations from fact and expert witnesses.

33.    The parties' submissions also responded to more than 50 objections submitted by Class Members regarding the proposed settlement.

34.    The Court held a hearing regarding the fairness, adequacy and reasonableness of the proposed settlement on June 7, 2005.

35.    Both Class Counsel and Defendant's Counsel made presentations in support of the proposed settlement at the June 7, 2005, hearing.  In addition, Class Members Paul G. Miller, pro se, and John H. and Rebecca J. Vogland, through their counsel, presented certain objections to the proposed settlement.

II.    THE TERMS OF THE SETTLEMENT

A.    Claim Review Process

36.    The Claim Review Process ("CRP") provides a simplified and stream-lined procedure to resolve Class Members' claims through an independent alternative dispute resolution process.  The CRP is designed to address the specific harm suffered by certain

Class Members as alleged in the Consolidated Amended Class Action Complaint, provided they can establish their claim pursuant to the terms of the Stipulation of Settlement and related documents.

37.     The CRP provides favorable and objective standards for evaluation of Class Members' claims, fair and efficient procedures, and relief designed to match the corresponding harm to Class Members.  The CRP is available only to Class Members who purchased policies within the six-year statute of limitations period applicable to MPCFA claims.  Significantly, the aggregate amount of relief to be provided through the CRP is not capped.

38.     The procedures of the CRP are simple and user friendly for claimants. Class Members were provided with an Election Form in the Settlement Notice Package. (Dahl Aff. Ex. A.)  Class Members wishing to participate in the CRP were instructed in the Settlement Notice Package to indicate their intent to participate in the CRP by returning the Election Form included in the Settlement Notice Package.  Consistent with the Stipulation of Settlement, eligible claimants who returned Election Forms will be sent a Claim Form.  (Stipulation of Settlement Ex. H.)  These claimants may then complete the Claim Form, which instructs claimants to set forth the basis of their claims. Claimants will further be instructed to attach and submit all documents in their possession that relate to their policy and claim.  Claimants may also submit affidavits or other information in support of their claim.  (Stipulation of Settlement § IV.C.1.)

39.     A Thrivent Representative will then evaluate the Claim Forms.   Using objective scoring factors set forth in the Stipulation of Settlement, the Thrivent Representative will score each claimant's claim, and propose relief based on the claimant's score and the relief tables attached to the Stipulation of Settlement.   An independent Policyholder Representative acting on behalf of claimants will notify claimants of the proposed relief, and if the relief is less than the highest level of relief allowed, give a recommendation as to whether the claimant should accept the relief proposed or seek further review.   If a claimant seeks further review, the Thrivent Representative and the Policyholder Representative will further evaluate the claim.  If the two representatives cannot agree on the relief to be awarded on the claim, then the dispute shall be submitted to and resolved by an independent Special Master.

40.     A range of factors set forth in the Stipulation of Settlement will govern the scoring of claims by the Claim Review Team.  (Stipulation of Settlement Ex. A.)  The parties negotiated these factors during the settlement process.  (Lockridge Final Approval Aff. ¶ 7.)  The factors are specially tailored to address the range of claims anticipated to be submitted by Class Members.

41.     There is no cumulative cap or maximum amount of CRP relief payable under the proposed settlement.  No Class Member's ability to receive full relief under the CRP is limited by the interest of any other Class Member in receiving full relief.  Further, the CRP award schedules in the Stipulation of Settlement's Exhibit A provide terminated policy claimants with relief that is reasonably consistent with the relief granted to in-

force policy claimants.  (See Aff. of Thrivent's Actuarial Expert John B. Snyder II, ("Snyder Aff.") ¶¶ 17-18.)

42.     Many courts have recognized the inherent value of including such dispute resolution mechanisms in settlements of complex consumer class actions that allege fraud claims.  As Magistrate Judge Erickson observed in a case dealing with allegations similar to this action:

> [W]e have been presented with no showing that the presentation of individualized claims, in separate proceedings, would be superior to the vehicle of a class action.  In apparent recognition of that fact, the settlement proposal does allow a cost-free mechanism for the resolution of separate claims, which would allow them to be fully litigated, notwithstanding the relatively modest recoveries that those claims would likely generate.  We think this provision speaks eloquently to the unlikelihood that any policy-holder would endure the cost of litigating a claim, in his or her own Court action, with the unlikely prospect of any generous recovery.

Snell v. Allianz Life Ins. Co. of N. Am., 97-2784, 2000 WL 1336640, at *14 (D. Minn. Sept. 8, 2000) (Erickson, Mag. J.); see also In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 294-95 (3d Cir. 1998).

43.     The CRP relief provides substantial benefits to the Class Members. Plaintiffs' expert estimates that the range of value of the CRP to Class Members is between $3.8 million and $9.2 million for each 1% of the policyholder population that participates in the CRP.  (See Aff. of Plaintiffs' Actuarial Expert Terry M. Long, FSA, MAAA, In Support of Final Approval of the Proposed Settlement ("Long Aff.") ¶ 12(a).)

B.      Contributed Insurance Benefit

44.     All members of the Class are eligible for the Contributed Insurance Benefit ("CIB").  Policyholders who purchased their policy after February 24, 1993, who do not elect to participate in the CRP will automatically receive the CIB.  Those Class Members who purchased their policies before February 24, 1993, whose claims under the MPCFA were ruled by this Court to be time-barred, will automatically receive the CIB.  They are not eligible to participate in the CRP.

45.     The CIB consists of accidental death benefit coverage in the amount of 8.5% of the face amount of the policy that makes a Class Member eligible for relief.  The duration of the CIB coverage is three years from the Eligibility Date, deemed for this purpose to be January 22, 2005.  If the insured under a policy passed away prior to the Eligibility Date, or if the insured passed away after the policy terminated but prior to the Eligibility Date, then a Class Member who is otherwise eligible to receive the CRP may designate an alternate measuring life to act as the insured for purposes of the CIB.  (Dahl Aff. Ex. A.)

46.     Plaintiffs' actuarial expert estimates the value to the Class of the CIB to be at least $18.6 million and may range up to a value of $24 million based on the value of comparable coverage available in the marketplace, (Long Aff. ¶ 12(a)), a range of value which the Court finds both accurate and reasonable.

C.    Release

47.    In exchange for the benefits described above, the Stipulation of Settlement contains a release that bars Class Members from asserting in any other lawsuit or proceeding any of the claims that have been or could have been asserted in the Actions. (Stipulation of Settlement § VIII.)   The release is set out in full in the Stipulation of Settlement, was reprinted in Appendix A to the Class Notice mailed to Class Members, and is included in the Court's Final Order Approving Class Action Settlement.

## III.    NOTICE TO CLASS MEMBERS AND CLAIMS ADMINISTRATION

48.    In its December 16, 2004 Order, the Court found that the Class Notice to be provided to Class Members, the procedures for mailing and re-mailing the Class Notice, and the Publication Notice constituted "the best practicable notice" and were "reasonably calculated, under the circumstances" to "meet the requirements of the Federal Rules of Civil Procedure (including Fed. R. Civ. P. 23(c)(2) and (e)), the United States Constitution (including the Due Process Clause), the Local Rules of the United States District Court for the District of Minnesota, and any other applicable law."   Based on the findings set forth below, the Court affirms these conclusions.

49.    Between February 4, 2005, and February 28, 2005, Rust mailed approximately 620,000 Class Notices by first-class mail to approximately 490,000 current and former Class Members owning single policies, and 130,000 to current and former Class Members owning up to five contracts, at their last-known addresses.   (Dahl

Aff. ¶ 14.)   These Class Notices related to approximately 845,000 Policies.   (Id. ¶ 15.)

The Class Notice was accompanied by, among other things, a cover letter summarizing

the Class Notice, a summary of the findings of the Special Master, a question-and-answer

brochure responding to anticipated questions about the case and the proposed settlement

and individualized forms regarding the settlement benefits available to the Class Member

(collectively, the "Class Notice Package").   (Id. ¶ 6; id. Ex. A.)   Through May 13, 2005,

Rust re-mailed 906 Class Notice Packages that were returned with a forwarding address,

as well as Class Notice Packages for which the search firms retained by Rust were able to

provide updated address information.   (Id. ¶ 17.)

50.     The Class Notice included, among other things: (1) the case caption; (2) a

description of the litigation; (3) a description of the settlement class; (4) identification of

Class Counsel; (5) a description of the proposed settlement, including the relief available;

(6) the full text of the release to be given Thrivent; (7) the date and time of the Fairness

Hearing; (8) information about entering an appearance at the Fairness Hearing

individually or through counsel; (9) the procedure and deadline for filing objections; (10)

the manner in which Class Members could obtain access to discovery materials produced

in the lawsuit; (11) the procedure and deadline for filing requests for exclusion; (12) the

consequences of requesting exclusion; (13) the consequences of remaining in the

settlement class; (14) a description of Thrivent's responsibility for Class Counsel fees and

expenses; (15) a description of the preliminary injunction issued by the Court; and (16)

the procedure for obtaining additional information, including the toll-free telephone

number established to respond to Class Member inquiries.  (Dahl Aff. Ex. A.)

51.    The Class Notice Package provided to Class Members contains clear and comprehensive documents that present, in a reader-friendly format, detailed and accurate information about the lawsuit, the proposed settlement and the options available to Class Members.  (Dahl Aff. ¶ 6.)  The Class Notice Package in this case is similar to the notice package considered in In re Prudential Ins. Co. of Am. Sales Practices Litig., wherein the Third Circuit Court of Appeals noted that "the provision of individual notice to each class member is by no means typical of the notice provided in most class actions, and certainly qualifies as unprecedented."  148 F.3d at 306.

52.    In addition to providing the Class Notice Package described above, the parties published the Publication Notice on February 24, 2005, in the national editions of Wall Street Journal and USA Today, as well as in the St. Paul Pioneer Press and the Minneapolis Star Tribune.  The combined daily circulation of the newspapers in which the Publication Notice appeared is approximately 4.6 million.  (Westmark Aff. ¶ 34.)

53.    The Court finds that the Publication Notice provided to Class Members is a clear and comprehensive summary of the proposed settlement that presents detailed and accurate information about the lawsuit, the terms of the settlement and the options available to Class Members.

54.    At the parties' direction, Rust also established the Lutheran Brotherhood Class Action Information Center, including, among other things, a toll-free telephone bank to respond to Class Member inquiries.  (Dahl Aff. ¶¶ 21-22.)  The toll-free number was included both in the Class Notice and in the Publication Notice, and both notices

informed Class Members that, if they had any questions about the settlement, they should call the toll-free telephone number. The Class Action Information Center was staffed with individuals who were trained by the parties to answer Class Member questions. (Id. ¶ 31.) As of May 13, 2005, the telephone bank had responded to over 30,000 policyholder inquiries. (Id. ¶ 37.) Class Counsel were on site at the Class Action Information Center from the opening to participate in the day-to-day operation of the center, to monitor Class Members' conversations with the operators and to speak directly with Class Members. (Id. ¶¶ 33-34.) As of May 13, 2005, Class Counsel had spoken directly with over 3,000 policyholders pursuant to their request. (Id. at ¶ 34.)

55.     Based upon its review of the Class Notice and Publication Notice materials, the Court concludes that the best practicable notice was given to the Class Members in this case and that the notice was reasonably calculated (1) to describe the Actions and the Plaintiffs' rights and (2) to apprise interested parties that the Actions were pending and of their right either to exclude themselves from the Class or to appear and object to the settlement. See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 812 (1985) (identifying the constitutional requirements of notice).

56.     The Court therefore affirms its findings and conclusion in its December 16, 2004, Order that the notice in the Actions meets the requirements of the Federal Rules of Civil Procedure (including Rules 23(c)(2) and (e)), the United States Constitution (including the Due Process Clause), the Rules of the United States District Court for the District of Minnesota, and any other applicable law.

## IV.    CLASS CERTIFICATION

### A.    The Settlement Class Meets the Requirements of Federal Rule of Civil Procedure 23

57.    The Settlement Class preliminarily certified by the Court in its December 16, 2004, Order meets the requirements for certification of a settlement class under Federal Rule of Civil Procedure 23.  The Settlement Class is broader than the litigated class previously certified by the Court and benefits Thrivent policyholders who were not included in the original class definition.

58.    Similar policyholder classes have been certified for settlement purposes in numerous class actions involving the sales practices of life insurance companies.  See, e.g., In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d. 283 (3rd Cir. 1998); In re New England Mut. Life Ins. Co. Sales Practices Litig., 183 F.R.D. 33 (D. Mass. 1998); Snell, 2000 WL 1336640.

59.    In Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 618 (1997), the Supreme Court expressly held that cases may be certified for settlement purposes only.  In doing so, the Supreme Court stated that the "dominant concern" on which a court should focus in deciding whether to certify a class is "whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives."  Id. at 621.  The Court further held that, when the question of certification is raised in connection with a class action settlement, "settlement is relevant to a class certification," id. at 619, and "must be considered as a factor in the calculus."  Id. at 622.  These

22

Findings of Fact and Conclusions of Law do not address whether the matter should be certified as a litigation class, as that determination involves different factors and analysis.

       1.     Rule 23(a)

    60.    Federal Rule of Civil Procedure 23(a) sets forth four requirements that must be met in order to certify a class: (1) the class must be so numerous that joinder of all members is impracticable; (2) questions of law or fact common to the class must exist; (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class; and (4) the representative parties must fairly and adequately protect the interests of the class.

    61.    The large number of Class Members demonstrates that joinder would be impossible and that the numerosity requirement is satisfied.  The Class consists of over 629,000 Class Members owning over 845,000 policies.   (Dahl Aff. ¶¶ 14-16.) Accordingly, the numerosity requirement of Rule 23(a) clearly is met.

    62.    Commonality exists where "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2); see also Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1148 (8th Cir. 1999); DeBoer v. Mellon Mortgage Co., 64 F.3d. 1171, 1174 (8th Cir. 1995).  The issue of Thrivent's sales practices relating to its disclosures and omissions regarding the assumptions underlying its policies, and whether those practices are actionable under the MPCFA, are common to all members of the Class.  Because the

23

commonality issue is also analyzed under Rule 23(b), it is further addressed in Section V.B. below.

63.    The typicality requirement is satisfied when the claims of the class representatives are based on the same legal theory as the claims of class members.  In re Hartford Sales Practices Litig., 192 F.R.D. 592, 603 (D. Minn. 1999) (Kyle, J.).  Because the claims of the Class Members are similar to those of the Class Representatives, typicality exists.  Alpern v. UtiliCorp United, Inc., 84 F.3d 1525, 1540 (8th Cir. 1996). Some variation in the individual claims of class members is not an impediment to class certification if all the claims arise from the same course of conduct and give rise to the same legal or remedial theory.  Id.; see also Donaldson v. Pillsbury Co., 554 F.2d 825, 831 (8th Cir. 1977); In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d at 310-12.  Here, all Class Members purchased policies from Thrivent.  The claims of all Class Members are based on Thrivent's disclosures, or lack thereof, in the sale of these policies.  As a result, the typicality requirement of Rule 23(a)(3) is met.

64.    In order to meet the adequacy requirement, the Court must determine that the Class Representatives will fairly and adequately protect the interests of the Class. Fed. R. Civ. P. 23(a)(4).  This requirement is typically broken into two elements: (1) that the class representatives and their counsel be able and willing to prosecute the claims of the class competently and vigorously; and (2) that the class representatives' interests are sufficiently similar to those of the class.  In re Potash Antitrust Litig., 159 F.R.D. 682, 689 (D. Minn. 1995) (Kyle, J.).

65.     There are no conflicts or antagonisms here between the Class Representatives and the Class Members.   All purchased life insurance policies from Thrivent.   The claims of all Class Members are based on Thrivent's sales practices in selling its life insurance policies.   In addition, Class Counsel are experienced in class action litigation, including life insurance sales practices litigation.   (Lockridge Final Approval Aff. at ¶ 4.)   The Class Representatives and Class Counsel have litigated this case for years, ultimately resulting in a settlement that provides substantial benefits to the Class.   Based on these findings, the Court concludes that the adequacy requirement of Rule 23(a)(4) is met.

2.     Rule 23(b)(3)

66.     In addition to the requirements of Rule 23(a), a class must also meet the requirements of one of the subdivisions of Rule 23(b).

67.     Rule 23(b)(3) requires that common questions of law or fact predominate over individual questions.   Amchem Prod. Inc., 521 U.S. at 622-25.   When a class of purchasers has allegedly been defrauded over a period of time by a similar course of misrepresentations and omissions, "courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit." Blackie v. Barrack, 524 F.2d 891, 902 (9th Cir. 1975).   A claim meets the predominance requirement when there exists generalized evidence that proves or disproves an element

on a simultaneous, classwide basis, since such proof obviates the need to reexamine each class member's individual position. In re Potash Antitrust Litig., 159 F.R.D. at 693; In re Workers' Comp., 130 F.R.D. 99, 108 (D. Minn. 1990) (Rosenbaum, J.). Consumer class actions involving large numbers of consumers allegedly victimized by a common course of conduct are particularly suited for settlement class treatment. See Amchem Prod., Inc., 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."). This suit involves the same common issues that were present in a number of life insurance sales practice class action settlements. See, e.g., In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d at 318.

68.     Further, the damages allegedly suffered by Class Members demonstrate that the claims of the Class are well suited for classwide resolution. Thrivent maintains detailed computerized records of its transactions with Class Members, making classwide determination of damages possible. This is reflected in the relief tables that will determine the relief to be provided to Class Members who successfully submit claims in the CRP. (Stipulation of Settlement Ex. A.) The tables were calculated using a comparison of the policy performances projected by Thrivent at the time of sale as compared to the actual policy performance experienced by Class Members.

69.     Rule 23(b)(3) also provides that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." This suit concerns

policies and damages that while significant, are of an amount such that a class action is a superior method for the fair and efficient adjudication of Class Members' claims.

70.   In addition, this forum is the most appropriate for adjudication of this controversy.  The Judicial Panel on Multidistrict Litigation consolidated the pending sales practices cases against Thrivent in this forum.  Further, Minnesota's strong interest in deterring deceptive conduct and its willingness to permit application of the MPCFA to the claims of residents of other states further supports resolving this action on a classwide basis in this forum.

71.   In sum, the identified Class in the Stipulation of Settlement meets the requirements of Rule 23.

## V.   FAIRNESS OF THE SETTLEMENT

72.   Public policy favors the settlement of complex class actions, and such settlements carry with them a strong presumption of validity.  Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No. 1, 921 F.2d 1371, 1388 (8th Cir. 1990).  The determination of whether to approve a settlement is within the discretion of the district court.  Grunin v. Int'l House of Pancakes, 513 F.2d 114, 123 (8th Cir. 1975).  Such deference is granted to the district court based on its ability to assess the settlement as a result of its exposure to the litigants and their strategies, positions, and the strength of their respective cases.  Petrovic, 200 F.3d at 1148.

73.     "Under Federal Rule of Civil Procedure 23(e), the district court acts as a fiduciary, serving as a guardian of the rights of absent class members." In re Wireless Tel. Fed. Cost Recovery Fees Litig., 396 F. 3d 922, 932 (8th Cir. 2005).   Accordingly, when determining whether to approve a proposed settlement, the Court must determine whether the settlement is fair, reasonable, and adequate.   Grunin, 513 F.2d at 123. Under Eighth Circuit law, fairness and adequacy of the settlement are determined by considering the following factors: (1) the merits of the plaintiff's case, weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement.   Id.

A.     Merits of Plaintiffs' Case and the Terms of the Settlement

74.     The first and most important factor is the comparison between the strength of the Plaintiffs' case versus the terms of the Settlement.   Van Horn v. Trickey, 840 F.2d 604, 607 (8th Cir. 1988); see also In re Wireless Tel. Fed. Cost Recovery Fees Litig., 396 F.3d at 933 ("The most important consideration in deciding whether a settlement is fair, reasonable, and adequate is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.") (quotations and citations omitted).  The Court should not try the merits of the case in the context of a fairness hearing, as the very purpose of the settlement is to avoid the delay and expense of such a trial.   Rather, the Court is only to inquire whether the possible rewards of continued litigation with its risks and costs are outweighed by the benefits of the settlement.

75.     While Class Counsel believes that Plaintiffs had a strong case against Thrivent, Thrivent likewise believes it has a number of strong defenses.  For example, the Court ruled that the claims of Plaintiffs who purchased their policies more than six years prior to commencing the Actions were barred from pursuing their claims by the MPCFA and its governing six-year statute of limitations, Minn. Stat. § 541.05 subd. 1(2). Although Plaintiffs sought to appeal this Order pursuant to 28 U.S.C. § 1292(b), the Eighth Circuit Court of Appeals declined to allow the appeal.  In the interim, and during the course of the settlement negotiations, the Eighth Circuit Court of Appeals upheld this Court's position in another case, Tuttle v. Lorillard Tobacco Co., 377 F.3d 917, 926 (8th Cir. 2004).  That decision greatly undercut any chance that Class Counsel had to obtain better relief for the pre-1993 policyholders.

76.     Also, as demonstrated by the litigation history, while the Class is represented by very capable counsel who intended to mount a strong and vigorous case against Thrivent, Thrivent also is represented by very capable counsel who throughout this litigation have mounted a zealous and thorough defense.  Thrivent has contested, and would have continued to contest, virtually every aspect of Plaintiffs' claims.

77.     Under the terms of the Stipulation of Settlement, however, Class Members are permitted to participate in a streamlined CRP that is fair to the claimants.  Typical burden of proof and evidentiary obstacles to claims are replaced by a set of objective factors in a simplified claim submission process that significantly eases the burden on claimants to successfully demonstrate their entitlement to relief.   In addition,

policyholders who purchased policies before 1993 will receive some modest relief in the form of an accidental death policy.

78.   Further, continued litigation would also have required that the Class rely substantially upon the testimony of expert witnesses to prove their claims.  Acceptance of expert testimony by a jury is always far from certain, no matter how distinguished and qualified the experts, inevitably leading to a "battle of the experts."  Settlement avoids the risk attendant to this "battle of the experts" that could have resulted in a ruling against Plaintiffs and the Class.

79.   In assessing the fairness, reasonableness, and adequacy of a settlement, the Court must also take into account the immediacy and certainty of a substantial recovery as balanced against the risks of continued litigation.  Such risks are especially present when pursuing claims against a defendant committed to a vigorous defense.  Weiss v. Mercedes-Benz of N. Am. Inc., 899 F. Supp. 1297, 1301 (D. N. J. 1995), aff'd, 66 F.3d 314 (3d Cir.1995).  In fact, insurance companies in similar cases have prevailed.  See e.g., Gaidon v. Guardian Life Ins. Co., 272 A.D.2d 60 (N.Y. App. Div. 2000); Brown v. Royal Maccabees Life Ins. Co., 137 F.3d 1236 (10th Cir. 1998) (affirming summary judgment for defendants).  In addition, in two cases in the District of Minnesota, defendants prevailed on vanishing premium claims.  Parkhill v. Minn. Mut. Life Ins. Co., 174 F. Supp. 2d 951 (D. Minn. 2000) (Doty, J.), aff'd, 286 F.3d 1051 (8th Cir. 2002); In re The Hartford Sales Practices Litig., MDL No. 97-MD-1204, Civ. No. 97-1619 (D. Minn. Mar. 8, 2000) (Kyle, J.).  Further, even a successful jury verdict in a deceptive

sales practices case may be subject to reversal on appeal.  In re Prudential Ins. Co. of Am.

Sales Practices Litig., 148 F.3d at 319-20.

80.   In addition, Special Master Borg prepared a thorough and complete

analysis of the strengths and weaknesses of this case, wherein he essentially exonerated

Thrivent of wrongdoing.  He noted, "Thrivent has a number of extremely strong defenses

that it might raise should the matter be litigated."  (See Report of Special Master Judge

John W. Borg ("Borg Report") at 5.)   After reciting the findings from a number of

regulatory agencies, Special Master Borg concluded as follows:

> The findings of the regulatory agencies and the facts outlined above present
> a substantial obstacle for Plaintiffs to establish Thrivent's liability.  The
> findings of these regulatory agencies support Thrivent's position and the
> following conclusions:
>
> 1.   Neither Lutheran Brotherhood, Thrivent nor their sales agents
> engaged in any pattern or practice of wrongdoing or misrepresentation
> relating to any allegation made in the Complaint;
>
> 2.   Neither Lutheran Brotherhood nor Thrivent committed any
> intentional, reckless, negligent or other wrongdoing relating to any
> allegation made in the [] Complaint or elsewhere;
>
> 3.   Lutheran Brotherhood and Thrivent's conduct throughout the period
> from February 24, 1993, to September 15, 2004, at all times has been fully
> consistent with their obligations to their members;
>
> * * *
>
> 8.   There is no evidence that Lutheran Brotherhood or Thrivent engaged
> in any deceptive sales or marketing practices;
>
> 9.   Thrivent has, and has had in place for many years, policies and
> training programs targeted at preventing any deceptive marketing of its life
> insurance products by its agents, and at ensuring the overall integrity of it
> insurance program;

10.     There is no evidence that Thrivent or Lutheran Brotherhood has or has had a "top-down" problem related to its sales and marketing practices, nor have Lutheran Brotherhood or Thrivent engaged in any misrepresentation or deceptive sales or marketing;

11.     Lutheran Brotherhood and Thrivent illustrations and other sales materials have always expressly and clearly stated that the values they project are based on the current dividend scale and could not be guaranteed; and

12.     Lutheran Brotherhood and Thrivent illustrations and sales materials were not misleading, but rather informed policyholders of necessary terms and conditions.

Although litigation is always an uncertain proposition for both parties, these factors illustrate the significant barrier to recovery that Plaintiffs faced, given the exemplary regulatory and service record achieved by Lutheran Brotherhood and Thrivent.

Borg Report at 11-13.

This Court concurs with these findings.

81.     In addition, the proposed relief fairly compensates Class Members for any alleged financial harm.  The settlement is structured to take into account the principal types of claims alleged, and Class Members have the opportunity to present claims for individual adjudication and relief under objective review criteria negotiated by the parties and submitted to the Court for approval.  (Snyder Aff. ¶ 15.)

1.      The Claim Review Process

82.     The CRP for which Class Members may be eligible is designed to provide compensatory relief for the principal types of harm alleged in the Actions.  The forms of relief, which are specified in greater detail in Exhibit A of the Stipulation of Settlement,

were developed to provide a relief structure consistent with the specifics of each CRP claim and are tailored to the specific types of harm alleged. (Id.)

83.     The Stipulation of Settlement fairly and equitably distributes relief because the CRP provides greater relief to those claims for which there is a greater amount of evidentiary support. The CRP applies four evidentiary standards to claims and distributes relief accordingly. With some qualifiers, the CRP awards: (1) the highest level of relief to Claims that are supported by credible documentation of misrepresentation; (2) the second highest level of relief to Claims that are established by clear and convincing evidence (60% of highest relief); (3) the third level of relief to Claims that are established by a preponderance of the evidence (30% of highest relief); and (4) the fourth level of relief to Claims that are not clearly refuted (CIB). (Id.)

84.     Through the CRP, the settlement provides a fair mechanism for considering individual claims. The CRP gives eligible Class Members access to a fair, simple and essentially cost-free mechanism to resolve all sales practice claims that arose regarding their policies during the Class Period. The CRP will allow such Class Members to present evidence in support of their claims and, if established according to the settlement's terms, receive relief promptly and without the substantial costs, risks and delay of continued litigation.

2.       General Policy Relief — The Contributed Insurance Benefit

85.     Thrivent will provide general policy relief to all Class Members regardless of whether they were misled — and regardless of whether they have evidence to support a claim that they were misled.  Specifically, Class Members who do not file a claim under the CRP will receive this general policy relief, the CIB, which is accidental death benefit coverage for three years in an amount equal to 8.5% of the face value of the policy making them eligible for relief.  The CIB is equitably distributed, since each recipient receives the same percentage of that policy's face amount as accidental death benefit coverage for the same period of time, regardless of the age, sex, underwriting status, or type of policy.  Class Members who have larger life insurance policies will receive larger amounts of CIB.  Importantly, no Class Member will receive the CIB at the expense of any other Class Member holding an eligible policy, either in force or terminated.  (Id. ¶ 19.)

86.     Policies issued prior to February 23, 1993, are also included in those automatically eligible for the CIB.  This relief is available notwithstanding the fact that this Court previously held that such claims are time-barred and that, if claims related to these policies were to continue to be litigated, they likely would be held to be time-barred as a final matter.

87.     Class Members who bought their policies on or after January 1, 1982, but before February 23, 1993, are not eligible for the CRP but they will automatically receive the CIB.  This relief is also available to Class Members who purchased policies on or after February 23, 1993, but who choose not to file claims under the CRP.  In this way, a

settlement benefit of value is available to all Class Members, even if they cannot or do not submit claims to the CRP.  (Id. ¶ 10.)

B.     The Defendant's Financial Condition

88.     The second settlement approval factor is the defendant's overall financial condition and ability to pay.  Grunin, 513 F.2d at 125.  Thrivent, as demonstrated by the long, hard-fought nature of this litigation, has the financial wherewithal to mount a vigorous defense.  Moreover, it possesses the assets to fund the substantial settlement without threatening the solvency of the company.  As a result, the settlement can be effectuated without causing detriment to other policyholders of Thrivent.

C.     The Complexity and Expense of Further Litigation

89.     Courts also evaluate the expense and potential duration of litigation as a factor to be considered in evaluating the reasonableness of a settlement.  Deboer, 64 F.3d at 1178 ("'[t]he very purpose of  compromise is to avoid the delay and expense of ... a trial.'") (quoting Grunin, 513 F.2d at 124).

90.     The claims of the Class are premised on challenges to the actuarial, accounting, investment and financial assumptions underlying Thrivent's policies.  Proving the Class's claims at trial would require proof of Thrivent's internal procedures for establishing interest crediting rates and dividend scales, the quality and performance of Thrivent's investments, and Thrivent's decision making relating to investments, pricing  assumptions,  product  development,  marketing  strategies,  and  other

determinations.   Evaluation and development of these complex factual issues would

necessarily entail substantial expert testimony concerning highly complex actuarial

methodologies, statutory accounting practices, and sophisticated financial theories.

(Lockridge Final Approval Aff. ¶ 5.)

91.    In addition, trial would have easily extended the litigation for a substantial

period of time, and the trial itself would surely have taken several weeks on the Court's

calendar.  Even in the event that Plaintiffs had prevailed, any such verdict likely would

have been years away.  Further, as indicated throughout the course of this litigation, and

as discussed in detail at the Fairness Hearing, Thrivent's resistance to the Class's claims

would undoubtedly have been aggressive, particularly given the resources at Thrivent's

disposal and the tenacity of its counsel.  Given Thrivent's record in this matter, should

Plaintiffs have succeeded at trial, they could have expected a vigorous appeal by

Thrivent.

92.    The risk of continuing litigation in the Actions through trial and appeal

weigh in favor of settlement approval, with its certain outcome and immediate relief to

Class Members.  This is particularly so given that those Class Members who wish to

pursue individual claims have the right to opt out and pursue their own remedy if they so

choose.  (Stipulation of Settlement § VI.)  This case has taken six years already, and the

parties have spent great sums of money.  In contrast, the settlement will grant Class

Members timely relief without having to endure the additional risk, complexity, duration

and expense inherent in this litigation.   The settlement includes a commitment by

36

Thrivent to provide immediate relief to Class Members, even if those Class Members have no factual support for their position or their claims would be legally barred or not otherwise provable.

D.     The Amount of Opposition to the Settlement

93.     The Court considered the number of requests for exclusion and objections as a gauge of opposition among Class Members to the settlement.   The paucity of objections to the settlement supports approval.   Petrovic, 200 F.3d at 1152 (approving settlement over the objections of four percent of class members).   Here, the exceedingly small number of exclusions and objections strongly favors a finding that the settlement is fair and adequate — especially considering that a significant portion of the exclusions and some objections were due to Class Members' expressed desire not to sue Thrivent or partake of any settlement that resulted from a lawsuit against their fraternal society. Finally, the attorneys' fees and costs to be paid by Thrivent to Class Counsel will not reduce the settlement benefits available to Class Members.   The negotiated relief is not to be reduced by attorneys' fees and costs to be paid to Class Counsel.   Moreover, the Court has the responsibility of determining the reasonableness of the attorneys' fees and expenses.   Thus, it was not necessary for the Class Notice to contain the amount of fees and expenses being sought by Class Counsel.   Accordingly, objections based on the lack of notice of attorneys' fees are without merit.

1.     Requests for Exclusion were Minimal

94.     Policyholders owning only 4,717 Policies requested to be excluded.  This number represents approximately 0.56% of all Policies in the Class. (Dahl Aff. ¶43.) This minute percentage of requests for exclusion is further evidence that the settlement should be approved.  Cf. In re Wireless Tel. Fed. Cost Recovery Fees Litig., 396 F.3d at 933 (affirming approval of class settlement when .00068% of the class objected to the settlement and .0024% of the class opted out).  The lack of exclusions is even more probative in light of the fact that a significant number of Class Members who provided a reason for excluding their policies from the Class indicated that they did so, not because they believed the settlement's terms were inadequate, but either because they opposed participating in any lawsuit against Thrivent as a matter of principle or are simply satisfied with their policies' performances.  (DeSanctis Aff. ¶ 19.)

2.     A Small Percentage of Class Members Objected

95.     Out of approximately 800,000 policyholders who received individualized notice, approximately 50 or .006% of all Class policyholders filed objections.  Six of these objected on the basis that they believed the claims against Thrivent were without merit.   (DeSanctis Aff. ¶ 16.)  This lack of substantive objections strongly suggests that the settlement is fair.  See Petrovic, 200 F.3d at 1152 (approving settlement where "fewer than 4 percent of the class members objected to the settlement, significantly fewer than the number of objectors to other settlements that have been approved."); DeBoer, 64 F.3d at 1178 ("The fact that only a handful of class members objected to the settlement similarly weighs in its favor.") (citation omitted).

### 3.      None of the Objections have Substantive Merit

98.     By far the most common objections are those from Class Members who purchased Policies before February 24, 1993, and object to the fact that the CRP is not available to them.   The key fact that demonstrates the lack of merit in this particular objection is that the Court ruled that these purchasers were barred by the six-year statute of limitations from proceeding with MPCFA claims.   The Eighth Circuit Court of Appeals upheld this position in <u>Tuttle</u>, 377 F.3d at 926.  Thus, if the case had continued to be litigated and not settled, these Class Members would have received nothing.  Many of these pre-1993 objectors state that the CIB is insufficient. But, when weighed against the alternative — no relief whatsoever — it is clear that the CIB is more than fair for these Class Members.  Furthermore, those Class Members who believe they have valid claims either under another theory, or that they could overcome the statute of limitations defense and pursue a MPCFA claim, could have chosen to exclude themselves from the Class in order to pursue these claims.

99.     For those objectors in this category who maintain that the CIB has no or nominal value, this objection is refuted by the record.  As set forth in the Long Affidavit, the aggregate value of the CIB relief to the Class has a value within the range of $18-24 million, depending on the valuation methodology utilized.  (<u>See</u> Long Aff. ¶ 12(a).)

100.   Other objections suggest alternative forms of relief that objecting Class Members would have preferred over those provided for by the Stipulation of Settlement. These objections fail to comprehend the role of the Court in determining whether to

approve a settlement and the proper analysis to be undertaken in such a determination. Because settlement of a class action, like settlement of any litigation, is basically a bargained exchange between the litigants, the judiciary's role is properly limited to the minimum necessary to protect the interests of the class and the public.  Judges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel.  Little Rock Sch. Dist., 921 F.2d at 1388.  The fact that some objectors may have preferred different forms of relief is not a reason to disapprove the Stipulation of Settlement.

101.   Several objectors object to the settlement on the basis that the underlying claims of the Class lack merit.  Perceived lack of merit of the claims is not grounds for disapproval of a settlement.   Instead, if the claims truly do lack merit, it only demonstrates that the benefits obtained by the settlement are beyond fair, reasonable, and adequate.

102.   A closely related objection is that the settlement does not benefit the Class Members because Thrivent is a fraternal organization, and the cost of providing the relief will negatively impact its membership.  However, Thrivent has determined and indicated that providing the settlement benefits will not have a material negative impact on the company and its members.  To the contrary, Thrivent has indicated its support for the settlement as being good for the company and its members, since it fairly resolves member concerns and puts this litigation behind them.

103.    Some of the objections lodged are directed at class action procedural requirements rather than the merits of the settlement.  One class member wants to be able to wait until final approval before having to decide whether to opt out.  Another class member believes the Class should not have been certified absent a finding of liability.  However, because the notice and settlement procedures in this lawsuit follow the dictates of Rule 23, these objections are not grounds for rejection of the settlement.

### E.    The Settlement is Not a Product of Fraud or Collusion

104.    "Rule 23(e) requires the court to intrude on [the] private consensual [settlement] agreement merely to ensure that the agreement is not the product of fraud or collusion and that, taken as a whole, it is fair, adequate and reasonable to all concerned." In re Wireless Tel. Fed. Cost Recovery Fees Litig., 396 F.3d at 934 (citation omitted). Thus, the Court must consider the views of the parties to the settlement.  Class Counsel, who are experienced in class action litigation, wholeheartedly support the settlement. The recommendation by Class Counsel and the good faith bargaining between the parties heavily favors settlement.  DeBoer, 64 F.3d at 1178 (citing counsel's experience as factor in favor of approving class settlement).  For the reasons that follow, the Court finds no impropriety or collusion relating to the Stipulation of Settlement.

105.    Courts give heightened scrutiny to resolutions of class actions where "the parties agreed upon a class definition and a settlement before formally initiating litigation, and then presented the district court with the complaint, proposed class, and proposed settlement."  Petrovic, 200 F.3d at 1145-46.  However, as in this case, where

"the parties engaged in more than three years of extensive discovery and preparation for trial, and the class was certified under Fed. R. Civ. P. 23(b)(3) many months before the parties reached the settlement," fears of collusion are not present.  Id. at 46.  This proceeding has been before the Court for six years.  In that time, the Court has ruled on a Motion to Dismiss, partially approved a Motion for Class Certification, and preliminarily approved the Stipulation of Settlement.  In addition, as discussed more fully above, Class Counsel conducted extensive document and deposition discovery — including the deposition of many key Thrivent officials, such as the executive in charge of its insurance program — before productive settlement discussions even commenced.  This discovery, as well as the other substantial factual discovery provided during the settlement negotiations, enabled Class Counsel not only to assess the merits of the Class Members' claims, but also to negotiate a settlement that provides relief specifically tailored to the Class Members' needs, thereby ensuring that no Class Member's interests have been unfairly compromised.  See Petrovic, 200 F.3d at 1149 (approving settlement where "prior to reaching settlement, [the parties] engaged in extensive discovery, argued numerous motions (including motions for summary judgment and for class certification), and in so doing submitted voluminous supporting memoranda with citations to affidavits and deposition testimony.").  Finally, there has been no objection to the adequacy of settlement discovery.

106.   In addition to evaluating the substance of the proposed settlement, the Court must examine the process by which it was negotiated to ensure against the interest of absent class members.  Petrovic, 200 F.3d at 1146.  The Stipulation of Settlement was

the product of extensive, contentious, arms-length negotiations between Thrivent and Class Counsel that lasted for well over a year. Negotiations included numerous mediation sessions, conferences and teleconferences, individual meetings with the Special Master, and a multitude of exchanges of settlement proposals. The Stipulation of Settlement and the implementing documents were the fruit of over twelve months of intense, detailed negotiations, which included the continual, intensive involvement and intervention of the court-appointed Special Master. (DeSanctis Aff. ¶¶ 2-9.) <u>See</u> <u>Murillo v. Texas A&M Univ. Sys.</u>, 921 F. Supp. 443, 445-46 (S.D. Tex. 1996) (there is a presumption that the settlement is fair when, among other things, it is negotiated at arm's length by counsel for the class). Accordingly, the Court finds that the Stipulation of Settlement is a product of fair negotiations and dealings.

## CONCLUSION

For the foregoing reasons, and based on all files, records and proceedings herein, the Court finds that the Stipulation of Settlement in this case is fair, reasonable, and adequate.

Dated: June 27, 2005

s/ Paul A. Magnuson
Paul A. Magnuson
United States District Judge